```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                   IN AND FOR THE DISTRICT OF DELAWARE

 3                                - - -

 4
        UNITED STATES OF AMERICA,      :   CRIMINAL ACTION
 5                                      :
                        Plaintiff,      :
 6                                      :
             vs.                        :
 7                                      :
        CHRISTOPHER EWELL,              :
 8                                      :
                        Defendant.      :   NO. 07-169 (SLR)
 9

10                                - - -

11                              Wilmington, Delaware
                                Wednesday, May 21, 2008
12                              11:15 o'clock, a.m.

13                                - - -

14      BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

15                                - - -

16      APPEARANCES:

17                   ILANA H. EISENSTEIN, ESQ.,
                     Assistant United States Attorney
18

19                      Counsel for Plaintiff

20

21                   ELENI KOUSOULIS, ESQ.,
                     Assistant Federal Public Defender
22

23                      Counsel for Defendant

24
                                Valerie J. Gunning
25                              Official Court Reporter
```

```
 1                     P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4      beginning at 11:15 a.m.)

 5

 6              MS. EISENSTEIN:  Good afternoon, your Honor.

 7              THE COURT:  Good morning.

 8              MS. EISENSTEIN:  Ilana Eisenstein, on behalf of

 9      the United States.

10              Your Honor, now is the time this Court has set

11      for a continuation of the suppression hearing in the matter

12      of United States of America versus Christopher Ewell,

13      Criminal Action No. 07-169 (SLR).  The defendant is present

14      in the courtroom with his counsel, Ms. Kousoulis.

15              Your Honor, as the parties explained to your

16      clerk, we have had some confusion and difficulty bringing

17      the drug evidence here to court.  It is on its way and we

18      expect will be here in the next five minutes or so, and in

19      the meantime, the purpose of this hearing was for the

20      defense to be able to present some expert testimony with

21      regard to whether or not such drug evidence could emit

22      noticeable odors, as I understand the purpose, and so the

23      government would like, if the Court wants to proceed this

24      way, to have an opportunity to hear the voir dire of the

25      defense witness and have an opportunity to voir dire that
```

1    witness by the government.  And then the witness, I believe,

2    would need an opportunity to review the drug evidence, which

3    should hopefully be here momentarily.

4            THE COURT:  Okay.

5            MS. EISENSTEIN:  Or is here.

6            THE COURT:  So the only question is, since the

7    drugs are here, that we start now or we allow whatever has

8    to be done so that the witness gets on the stand, we go

9    through the examination without interruption.

10           MS. EISENSTEIN:  Yes, your Honor.  I don't

11    believe the defense has an objection.

12           The government would like the opportunity to

13    recall Officer Brian Conkey, who is here in the courtroom,

14    to identify the drugs and explain the condition that they're

15    in currently versus the condition that they may have been in

16    at the time that he seized the drugs.

17           THE COURT:  All right.

18           MS. EISENSTEIN:  So we could proceed with that

19    right now.

20           MS. KOUSOULIS:  And, your Honor, I have no

21    objection to that.  I may also have a couple of questions

22    for, additional questions for Officer Conkey.

23           THE COURT:  So is it the position of counsel

24    that we should recall Officer Conkey, take care of that

25    preliminary matter, take a break and let the expert do what

4

Conkey - direct

1    the expert is going to do and then reconvene at some stated

2    hour?  I think I have back-to-back proceedings starting at

3    2:00, so I need to make sure that we get done that.

4                MS. KOUSOULIS:  Your Honor, it shouldn't take

5    more than five minutes for my expert to look at the drug

6    evidence and talk to him for a few minutes.  I wanted the

7    opportunity to see the evidence before he testified.

8                THE COURT:  All right.  Why don't we recall

9    Officer Conkey.

10               MS. EISENSTEIN:  Thank you, your Honor.

11               THE COURT:  And since it has been so long, we

12   might administer the oath to you again, sir.

13                      PLAINTIFF'S TESTIMONY

14               ... BRIAN E. CONKEY, having been duly

15               sworn as a witness, was examined and

16               testified as further ...

17                      DIRECT EXAMINATION

18   BY MS. EISENSTEIN:

19   Q.    Good afternoon, Officer.

20   A.    Good afternoon.

21               MS. EISENSTEIN:  Your Honor, may I approach the

22   witness?

23               THE COURT:  Yes, you may.

24               MS. EISENSTEIN:  Thank you.

25   BY MS. EISENSTEIN:

5

Conkey - direct

1    Q.    I'm showing what has been marked as Exhibit 1A to

2    defense counsel, for the record (handing exhibit to the

3    witness).

4              Officer, could you open that envelope, please,

5    for the Court and examine the contents?

6              (Pause.)

7    BY MS. EISENSTEIN:

8    Q.    And can you explain to the Court what that is?

9    A.    It's four zip-lock baggies containing a green-like

10    substance, tan-like substance.

11    Q.    And do you recall seizing or testifying to the fact

12    that you seized drug evidence from Christopher Ewell on the

13    night of November, on the day of November 26th, 2007?

14    A.    Yes.

15    Q.    And do you recall the appearance of the marijuana

16    evidence that you seized or something that appeared to be

17    marijuana evidence on that day?

18    A.    Yes.

19    Q.    And can you compare for the Court how the marijuana

20    evidence packaged here today compares with the evidence on

21    that day, November 26th, 2007?

22    A.    Yes.  It has the same, like, four yellow zip-lock

23    baggies containing a plant-like substance.

24    Q.    On that day is it correct you previously testified

25    that these four yellow baggies were also contained in a

Conkey - direct

1    sandwich bag?

2    A.    Yes.

3    Q.    And is the sandwich bag contained in that yellow

4    envelope that you opened earlier?

5    A.    I don't see it in here.

6    Q.    Okay.  And can you describe, is that just a standard

7    sandwich bag that one would purchase in the store or is it

8    something different?

9    A.    Yes.

10   Q.    Now, what about, do you notice any odor currently

11   emanating from this substance here?

12   A.    Yes.

13   Q.    And can you describe what kind of odor is emanating

14   right now from the substance?

15   A.    It's unlit marijuana.

16   Q.    Can you compare the, both the strength and the type of

17   odor as you observe it right now compared with the type of

18   odor that you smelled on the day of November 26th, 2007,

19   from the defendant's car?

20   A.    It's the same odor, especially since with the heat

21   coming out of the vehicle, the heat was stronger than it is

22   today.

23   Q.    And what kind of baggies would you describe these

24   as?

25   A.    To my knowledge, my experience on the street, these

Conkey - cross

1    are packaged for sale.

2    Q.    Now, I mean, are they zip-lock bags or some other kind

3    of bags?

4    A.    Yes.  Zip-lock bags.

5    Q.    Would you describe these as heat-sealed?

6    A.    No.

7    Q.    And on the day in question, were the bags heat-sealed?

8    A.    No.

9            MS. EISENSTEIN:  Thank you, your Honor.  Nothing

10    further.

11            THE COURT:  All right.  Cross.

12            MS. KOUSOULIS:  Yes, your Honor.  May I just

13    have one moment, your Honor?

14            THE COURT:  Yes.

15            (Pause.)

16                    CROSS-EXAMINATION

17    BY MS. KOUSOULIS:

18    Q.    Officer Conkey, do you recall testifying in this

19    matter on March 18th, 2007?

20    A.    Yes.

21    Q.    And on that day, you testified that they were

22    heat-sealed bags, not just zip-lock backs; correct?  Do you

23    recall?

24    A.    Not to my knowledge.

25    Q.    Do you recall being asked the question, And they were

Conkey - cross

1    all heat-sealed bags; is that correct?

2              And you answered, Correct?

3    A.    Not to my knowledge.

4    Q.    But your testimony today is that they weren't

5    heat-sealed.  Is that your testimony?  They were just

6    zip-lock bags?

7    A.    Correct.

8    Q.    Now, you testified that here in court, as you hold

9    those bags, that you notice an odor of marijuana?

10   A.    Not as strong as that day.

11   Q.    But your testimony was on direct that you smelled

12   marijuana; correct?

13   A.    Yes.

14   Q.    And that you currently smell marijuana coming from the

15   bags?

16   A.    Yes.

17   Q.    And it's fair to say that since the time when you

18   recovered those bags from the jacket pocket, which was

19   Defense Exhibit 2, that those bags have been opened and

20   tested; correct?

21   A.    To my knowledge, yes.

22   Q.    So if those bags had been heat-sealed, as you

23   testified to back on March 18th, at some point between

24   March 18th and today, they were open in order to be tested;

25   correct?

                            Conkey - cross

1    A.      Seems like one bag.

2    Q.      Was open?

3    A.      Yes.

4    Q.      Now, are you aware of a letter sent to me by Assistant

5    United States Attorney Ilana Eisenstein regarding the case

6    of United States versus Ivan Jackson?

7    A.      Yes.

8    Q.      And you testified in an evidentiary hearing for -- in

9    the case of United States versus Ivan Jackson, in federal

10   court, in front of Chief Judge Sleet; correct?

11   A.      Correct.

12   Q.      And are you aware that Chief Judge Sleet, in granting

13   the defendant's motion to suppress evidence in that case,

14   determined that your testimony was not credible?

15           MS. EISENSTEIN:  Objection, your Honor.  That's

16   impeaching the witness.  Under Federal Rule of Evidence

17   608(b), there's no extrinsic evidence permitted in that.

18           MS. KOUSOULIS:  Your Honor, the Seventh Circuit,

19   in the case of United States versus Dawson, and I do have a

20   copy of the case for the Court, found that whether to allow

21   a witness to be cross-examined about a prior initial

22   determination finding him not to be credible is confined to

23   the discretion of the trial judge and it does not fall under

24   that rule and it is permissible because extrinsic evidence

25   is not being used.  A question is simply being asked of the

Conkey - cross

1    witness.

2                    And I can pass that case up.

3                    THE COURT:  Well --

4                    MS. KOUSOULIS:  And --

5                    THE COURT:  I'm not confident that that is

6    particularly compelling evidence, but I will let you ask the

7    question.

8                    MS. KOUSOULIS:  Your Honor, I would also like to

9    mark that case of United States versus Ivan Jackson into

10   evidence.  I believe that it goes to the officer's, the fact

11   that he may have been found not credible in another case by

12   another judge would go to this officer's credibility.

13                   THE COURT:  I said I would let you ask the

14   question.  I'm not going to let you have that as an

15   exhibit.

16   BY MS. KOUSOULIS:

17   Q.    Are you aware that Chief Judge Sleet, in granting

18   the defendant's motion to suppress evidence in that case,

19   determined that your testimony was not credible?

20   A.    Yes, I know it was suppressed, but I didn't know the

21   reason why.

22                   MS. KOUSOULIS:  I have no further questions.

23                   THE COURT:  All right.  Any redirect?

24                   MS. EISENSTEIN:  Briefly, your Honor.

25                   I'm showing defense counsel the transcript of

Conkey - redirect

1    the original suppression hearing, dated March 18th, 2007,

2    which I've marked just for identification as Government

3    Exhibit B.

4                         REDIRECT EXAMINATION

5    BY MS. EISENSTEIN:

6    Q.    Turning to Page 14 of that --

7              MS. EISENSTEIN:  May I approach the witness,

8    your Honor?

9              THE COURT:  Yes.

10             MS. EISENSTEIN:  May I direct from here just

11   momentarily?

12             THE COURT:  Yes, although this might -- I'm not

13   sure what you are doing, so this might change my decision on

14   what Ms. Kousoulis asked me to do.  But go ahead and we'll

15   see.

16   BY MS. EISENSTEIN:

17   Q.    Just reading Page 4, describing for the Court how

18   those bags, the questions, can you describe for the Court

19   how those bags were packaged?

20   A.    It says, "They were all packaged in small zip-lock

21   bags, packaged for sale."

22   Q.    And --

23   A.    "Were the four zip-lock bags loose or were they in

24   large bags?

25             "They were in a sandwich bag."

Conkey - redirect

1          THE COURT:  That's from this hearing?

2          MS. EISENSTEIN:  Yes, your Honor.

3          THE COURT:  Okay.  I'm sorry.

4          MS. EISENSTEIN:  And, your Honor, I believe I

5  failed to do this, just on the initial, but the government

6  would formally move for the admission of Government's

7  Exhibit 1A, which would be the drug evidence, into

8  evidence.

9          MS. KOUSOULIS:  No objection.

10          THE COURT:  All right.  Thank you.

11          (Government Exhibit 1A was received into

12  evidence.)

13          MS. EISENSTEIN:  Your Honor, the government has

14  nothing further.

15          THE COURT:  All right.  Anything further of this

16  witness?

17          MS. KOUSOULIS:  No, your Honor.

18          THE COURT:  All right.  You may step down.

19  Thank you.

20          (Witness excused.)

21          THE COURT:  All right.  Are we talking a break

22  at this point?

23          MS. KOUSOULIS:  Yes, your Honor, if we may, for

24  just five minutes.

25          THE COURT:  Well, we're going to take it for 15.

Conkey - direct

1    A five-minute break is hardly worth my time.

2                    (Witness excused.)

3                    (Short recess taken.)

4                        -  -  -

5                    (Proceedings resumed after the short recess.)

6                    THE COURT:  Ms. Kousoulis?

7                    MS. KOUSOULIS:  Yes.  Your Honor, if I could

8    briefly recall Officer Conkey, just to introduce some

9    pictures?

10                   THE COURT:  All right.  And we will not

11   re-administer the oath at this time.

12                   MS. KOUSOULIS:  That's fine.

13                   THE COURT:  I will just remind him that he still

14   is under oath.

15                        DEFENDANT'S TESTIMONY

16               ... BRIAN CONKEY, having been previously

17         duly sworn as a witness, was examined and testified

18         follows as follows ...

19                        DIRECT EXAMINATION

20   BY MS. KOUSOULIS:

21   Q.    Morning, Officer Conkey.

22   A.    Good morning.

23   Q.    Officer Conkey, you testified that the four little

24   bags of marijuana that were marked as Government Exhibit 1A

25   were found in another plastic -- inside a plastic sandwich

14

Conkey - direct

1    bag inside the pocket of the jacket that was in the car;

2    correct?

3    A.    Correct.

4    Q.    I'm showing you what has been marked --

5              MS. KOUSOULIS:  May I approach the witness?

6              THE COURT:  Yes, you may.

7    BY MS. KOUSOULIS:

8    Q.    I'm showing you what has been marked as Defense

9    Exhibit 4 for identification purposes (handing exhibit to

10   the witness).

11             Is that a picture of the plastic bag that

12   contains the four smaller bags of marijuana in it?

13   A.    Yes.

14   Q.    And the plastic bag that is depicted in Defense

15   Exhibit 4, is that the same plastic bag that the drugs,

16   the four little bags of drugs were found in inside the

17   pocket?

18   A.    Yes.

19   Q.    And this bag, this bigger plastic bag, was not with

20   the drugs when you just -- the drugs that you were just

21   shown on direct that was Government Exhibit 1A; is that

22   correct?

23   A.    Correct.

24   Q.    Do you know what happened to that plastic bag?

25   A.    No, I do not.

Conkey - direct

1    Q.    And just showing you briefly what has been marked

2    Defense Exhibit 5 for identification purposes, is this a

3    picture of the jacket where you found that bag with the

4    drugs in it?

5    A.    Correct.

6              MS. KOUSOULIS:  Your Honor, I would move the

7    admission of Defense Exhibit 4 and 5 into the record.

8              MS. EISENSTEIN:  No objection, your Honor.

9              THE COURT:  All right.  Thank you.

10             MS. KOUSOULIS:  And I have no further questions.

11             (Defendant's Exhibit No. 4 and Defendant's

12   Exhibit No. 5 were received into evidence.)

13             THE COURT:  All right.  Any other questions of

14   this witness?

15             MS. EISENSTEIN:  Nothing further, your Honor.

16             THE COURT:  All right.

17             (Witness excused.)

18             MS. EISENSTEIN:  At this time, the government

19   would ask that Officer Conkey be dismissed.

20             MS. KOUSOULIS:  That's fine, your Honor.

21             THE COURT:  All right.  Thank you very much.

22             And, Ms. Kousoulis?

23             MS. KOUSOULIS:  Your Honor, at this time, the

24   defense would call Dr. Stephen Duerr.

25             THE COURT:  All right.

Duerr  - direct

1          (Witness excused.)

2              ... J. STEPHEN DUERR, having been duly

3      sworn as a witness, was examined and testified as

4      follows ...

5                    DIRECT EXAMINATION

6   BY MS. KOUSOULIS:

7   Q.    Good morning, Dr. Duerr.

8   A.    Good morning.

9          MS. KOUSOULIS:  Your Honor, may I approach the

10  witness?

11         THE COURT:  You certainly may.

12  BY MS. KOUSOULIS:

13  Q.    Dr. Duerr, showing you what has been marked Defense

14  Exhibit 3 for identification purposes (handing exhibit to

15  the witness), is that your curriculum vitae?

16  A.    Yes.

17  Q.    And could you give the Court a brief background of

18  your training and experience -- education and experience in

19  the field of forensic chemistry?

20  A.    My education includes three degrees:  Bachelor's,

21  Master's and Doctorate in Metallurgy.  At the time I got my

22  education in metallurgy, that was the name of the program.

23  It shortly after that became Material Science.

24         The courses I took were in metals, but also in

25  ceramics and plastics and other materials.  Included a lot

Duerr  - direct

1   of chemistry, physical chemistry, analytical chemistry.

2           The -- my experience in the workplace for the

3   last 30 years has been in independent laboratories, working

4   basically as a chemist.  I have a certification that is

5   called Certified Professional Chemist.  I'm registered in

6   the State of New Jersey as a Professional Engineer.

7           The -- my forensics experience has extended over

8   20 years, with analyses related to arson, analyses related

9   to controlled substances.  And some of that has ended up in

10  court testimony.

11  Q.    And where are you currently employed?

12  A.    The current name of the company is Libra, L-i-b-r-a,

13  Libra Technical Center.  Before that, it was Metuchen

14  Analytical.  That has been where I've worked, well, for

15  20 years.

16  Q.    And what are some of your daily activities with regard

17  to your job?

18  A.    We analyze food, drugs, cosmetics, primarily for the

19  manufacture -- manufacturers of those products.  We analyze

20  for purity, strength.

21          We analyze the packaging and the effect of the

22  packaging on the -- on the -- on the material, the food or

23  the drug, actually, or the cosmetics, how the packaging

24  allows that product to retain its -- its properties, either

25  the active drug strength or the -- or the appearance or the

Duerr  - direct

1    odor or whatever of properties are important for the

2    particular product.

3    Q.    So do you have experience in analyzing controlled

4    substances specifically and their properties?

5    A.    Yes, I do.

6    Q.    And can you describe your experience?

7    A.    Well, for 20 years, at various points in time,

8    either -- either the -- well, either the DEA or the police

9    have -- police detectives have brought evidence to my

10   laboratory, or in some cases, I have gone to the police

11   laboratory, and in both cases, I would weigh the evidence

12   material, the cocaine or the heroin or the marijuana, the

13   weight being an important part of the case.  I would weigh

14   it and then I would also take a portion and analyze it for

15   its -- for the identification and usually strength of the --

16   of the drug that was in that evidence.

17   Q.    And how would you conduct that type of analysis?

18   A.    Well, for -- for cocaine and heroin, the analysis is

19   by gastroentography.  For marijuana, the analysis is by

20   microscopy.

21   Q.    And what does that mean?  If you can explain it in

22   layman's terms.

23   A.    Marijuana is -- is made from plant material, and the

24   characteristics -- the appearance of the plant material

25   under a microscope has -- has certain features that are

Duerr  - direct

1    characteristic of marijuana.

2    Q.    And are you familiar with the properties of marijuana

3    and what it is in marijuana chemically that accounts for its

4    odor?

5    A.    Yes.

6    Q.    And what is that?

7    A.    Well, the -- well, the -- the component, the THC, the

8    chemical compound that is the active ingredient in marijuana

9    that gives the person the effect is one portion of that, but

10   any -- any of the volatile materials that are in the plant

11   contribute to the odor.  Volatile just means that the solid

12   or liquid material that's within the plant material becomes

13   vapor, becomes gas, and goes into the air, and we can then

14   smell it with our nose.

15   Q.    Have you ever been qualified as an expert in forensic

16   chemistry in analyzing chemical properties of controlled

17   substances in federal court before?

18   A.    Yes.

19           MS. KOUSOULIS:  Your Honor, at this time I would

20   like to offer Dr. Duerr as an expert in forensic chemistry,

21   knowledgeable in analyzing controlled substances and in

22   the properties of controlled substances, including

23   marijuana.

24           MS. EISENSTEIN:  Your Honor, the government

25   would like a couple of questions to voir dire the witness

                              Duerr  - direct

1    before.

2                    THE COURT:  All right.

3                    MS. KOUSOULIS:  Before I forget, I would just

4    move Defense Exhibit 3 into evidence.

5                    MS. EISENSTEIN:  No objection.

6                    MS. KOUSOULIS:  The C.V.

7                    THE COURT:  All right.

8                    MS. KOUSOULIS:  Thank you.

9                    (Defendant's Exhibit No. 3 was received into

10   evidence.)

11   BY MS. EISENSTEIN:

12   Q.    Dr. Duerr, good afternoon.  Almost afternoon.  Good

13   morning.

14                    In terms of your training and experience, you

15   spoke of analyzing generally the properties of controlled

16   substances.

17                    What about specifically the smell of controlled

18   substances?  What is your experience with regard to how

19   controlled substances smell?

20   A.    In -- in every case that I've analyzed, I've been

21   presented with the evidence in some sort of an evidence

22   envelope or in some other way of storage, so I've had the

23   opportunity to -- to detect or not detect the odor of all

24   of the substances that I've examined.

25   Q.    Have you personally reviewed any studies that assess

Duerr  - direct

1  the ability of people in general to smell controlled

2  substances, specifically marijuana?

3  A.    I have not reviewed such studies, no.  I know I can

4  smell marijuana.

5  Q.    So would your testimony then today be based solely on

6  your own ability or experience in detecting the smell of

7  marijuana?

8  A.    Well, it's based on that as well as the -- the

9  material's properties of marijuana and other controlled

10  substances.

11           MS. EISENSTEIN:  Nothing further, your Honor.

12           THE COURT:  All right.  Anything further?

13           MS. KOUSOULIS:  No.  At this time I would offer

14  Dr. Duerr as an expert in forensic chemistry, knowledgeable

15  in analyzing controlled substances and in the properties of

16  controlled substances, including marijuana.

17           THE COURT:  All right.  Is there an objection

18  from the government?

19           MS. EISENSTEIN:  No, your Honor.

20           THE COURT:  All right.

21  BY MS. KOUSOULIS:

22  Q.    Dr. Duerr, in this case, did you have the opportunity

23  to look at four small bags of marijuana that was marked

24  Government Exhibit 1A?

25  A.    Yes.

Duerr  - direct

1   Q.    And these four small bags were contained in another

2   plastic bag that was inside a jacket pocket.  Were you aware

3   of that?

4   A.    Yes.  I've been told that.

5   Q.    And did you have the ability to look at the jacket,

6   which was marked Defense Exhibit 2?

7   A.    Yes.

8   Q.    And under these circumstances of the four bags, small

9   bags of marijuana inside another plastic sandwich bag inside

10  the jacket pocket that you looked at, based on your

11  experience and education, what is your opinion as to

12  whether or not the four heat-sealed bags recovered by the

13  police in this case would have a noticeable odor?

14  A.    I do not believe they would have had a noticeable

15  odor.

16  Q.    And on what do you base your opinion?

17  A.    Based on I don't smell a noticeable odor right now,

18  and there's -- they were in sealed bags.  There was no

19  reason for this to be an increased odor under the

20  circumstances that I've heard.

21  Q.    Now, would the amount of the marijuana that was

22  recovered affect your opinion?

23  A.    The amount does affect the -- the total amount of

24  marijuana does affect the total -- the amount of the odor

25  that one would notice, would smell.

Duerr  - direct

1          This is a very small quantity of marijuana, so

2     the odor associated with it would be -- would be small as

3     well.

4     Q.    So is it fair to say that the larger quantity of

5     marijuana, the more smell it would potentially give off?

6     A.    Yes.

7     Q.    And what accounts for the smell in marijuana?

8     A.    Well, it's really whatever --

9     Q.    Strike that.

10          The marijuana in this case was unused marijuana;

11    correct?

12    A.    Yes.

13    Q.    And what accounts for the smell in unused marijuana?

14    What chemical properties are responsible for giving off an

15    odor?

16    A.    Well, there are chemical compounds in the plant,

17    some of which -- well, there's a range of chemical compounds

18    in the plant, and they have a range of volatility, so

19    the more volatile, the ones that give off more odor, dry

20    first.

21          So the plant material, of course, the -- the

22    volatile material that is there in the plant in the highest

23    concentration is water.

24          So to get -- to get the marijuana from the plant

25    form to the -- to the dried powder kind of form that is in

Duerr  - direct

1    those bags, it has to be dry, so that the drying process

2    evaporates the water.  At the same time, it evaporates the

3    more volatile portions of the -- of the plant material.

4              So what's left in that dried powder is the least

5    volatile compounds that are present in the plant.

6    Q.    So as the least volatile compounds, is it fair to say

7    that that portion left in the bags gives off the least

8    amount of odor?

9    A.    Correct.  It's like the -- it's like the -- like a

10   mint plant that you grow in your garden.  You -- you pick

11   the mint leaf and you crush it and you smell it.  It has a

12   strong odor.  But after it is dried in the -- on the

13   counter, it does not have that odor.

14             So you -- if you want to make a -- whatever, a

15   Mint Julep, you use the very fresh mint leaves that have the

16   strongest odors.

17   Q.    Now, what happens if you put marijuana that has been

18   freshly cut from the plant in a plastic bag?

19   A.    Well, if you literally took the plant material, put

20   it in a plastic bag, it would grow mold, because the -- the

21   water, the moisture in the plant, would support the growth

22   of the mold.  So you can't do that.

23   Q.    Now, what effect -- there was testimony in this case

24   that there was heat coming from the car from the heater, and

25   that that may have had an effect.

Duerr  -  direct

1              What effect, if any, in your opinion, would heat

2     coming from the car have on the marijuana and whether or not

3     it would give off an odor because of its contact with the

4     heat in the car?

5     A.    Well, I don't believe that it would have had any

6     effect at all.  It really is not very much heat.  The reason

7     the heat was on was because it was a cold day.  I mean,

8     that's why one has the heat on.

9              So the -- the heat on in the car may have

10    brought the -- the car temperature up to room temperature,

11    this kind of room temperature, or somewhat higher.  But in

12    the laboratory, when we want to do an experiment to analyze

13    the volatile material, we use -- well, sometimes we use a

14    hundred degrees C, which is boiling water, 212 Fahrenheit,

15    but the lowest temperature we would use would be 80 degrees

16    Centigrade, and that's 175 degrees Fahrenheit, which is way

17    over what would have been in the car.

18    Q.    Now, in this case, the marijuana was packaged in

19    four small bags.  If these bags were heat-sealed, what

20    effect, if any, would that have, the packaging of the

21    marijuana in this case have on whether or not an odor

22    could be detected?

23    A.    Well, the -- the heat seal would prevent any escape of

24    volatile material from the bag except for a very small

25    amount that would go -- would diffuse through the plastic.

Duerr  - direct

1    And we know from our food work that -- that odors do go

2    through plastic, but not quickly.  It takes -- takes time

3    and temperature for that to happen.

4    Q.    And, again, would the temperature of the heat being on

5    in the car be sufficient enough temperature?

6    A.    No, no.  I'm talking about elevated temperature.

7    I'm not talking about room temperature or whatever the car

8    was, no.

9    Q.    Now, what if the bags weren't heat-sealed?  They were

10   just zip-lock bags?  Would that have an effect on whether or

11   not any gases or odor would be detectable?

12   A.    Oh, it would depend on -- on how well sealed that

13   zip-lock is.  But the zip-lock has to be pretty well

14   closed.  When the zip-lock is carefully closed, then it's --

15   it's pretty close to a heat seal.

16             It has -- the zip-lock has to be pretty well

17   sealed.  Otherwise, it would -- it would open up under

18   normal handling.

19             So the -- just the self-protective nature of the

20   person sealing the zip-lock would -- would require that that

21   zip-lock would be pretty well sealed, and that would -- that

22   would provide, or that would -- yes, the carefully sealed

23   zip-lock would provide a pretty good barrier to any odor

24   that would come out.

25   Q.    And have you had occasion to, in your experience, to

Duerr  - direct

1   analyze plastics?

2   A.    Yes.

3   Q.    And is there a difference between something being

4   sealed in a plastic bag as opposed to a paper bag?

5   A.    The -- there's a great difference between -- between

6   the two.  It goes back to my statement about sealing

7   the -- the marijuana plant in plastic, that being bad,

8   because the moisture supports the growth of mold.

9           So normally the fresh plant has to be stored in

10  a paper bag so that the moisture can get out and the mold

11  does not take over the evidence.

12  Q.    But, again, you testified previously that with that

13  moisture and the vapors escaping, most of the odor escapes

14  also?

15  A.    Yes.  Yes.  The most volatile portion, the part that

16  has the most odor, is evaporated off.

17  Q.    So in this case, it's your opinion that given how the

18  drugs were packaged in the sealed or zip-lock bag and inside

19  of another bag inside the coat pocket, in your opinion, it

20  would not give off an odor to someone standing next to the

21  car?

22  A.    That's my opinion.  It would not give off an odor.

23           MS. KOUSOULIS:  I have no further questions.

24           THE COURT:  All right.  Cross-examination.

25           MS. EISENSTEIN:  May I approach the witness,

Duerr  - cross

1  your Honor?

2              THE COURT:  Yes, you may.

3                          CROSS-EXAMINATION

4  BY MS. EISENSTEIN:

5  Q.    I'm showing you what has been marked as Government's

6  Exhibit 1A and has been admitted as Government's Exhibit 1A

7  (handing exhibit to the witness).

8              Now, was your testimony on direct that you did

9  not discern an identifiable odor from the examination of the

10  contents of Government's Exhibit 1A; is that correct?

11  A.    Yes.

12  Q.    And were you able to -- did you have an opinion about

13  what is contained in Government's Exhibit 1A, what is the

14  substance contained in that?

15  A.    Without microscopic examination, I would not venture

16  an opinion.  It's clearly a -- a dried plant material, or

17  looks, by eye, looks like a dried plant material.

18  Q.    If you would, would you just take the contents of

19  Government's Exhibit 1A out?

20              Now, is it fair to say that those constitute

21  four zip-lock bags; is that right?

22  A.    I -- they're -- there is a zip-lock portion of the

23  bag.  I'm fairly certain that at least one of them is

24  heat-sealed.

25  Q.    What about the other three?  Are the other three

29

Duerr  -  cross

1    heat-sealed?

2    A.    The other three may not be heat-sealed.  I do see

3    some -- some of the greenish material coming out, which

4    suggests that it's not a heat seal.

5    Q.    Now, you testified that your opinion about the smell

6    of marijuana, whether it be fresh or dried, is based on your

7    own experience in smelling pieces of evidence that came into

8    your lab; is that correct?

9    A.    Yes.

10    Q.    And right here you say that you don't smell anything;

11    is that correct?

12    A.    Right.

13    Q.    So is it fair to say that your sense of smell is not

14    perhaps the most acute, or would you have a basis for

15    comparison?

16            MS. KOUSOULIS:  Your Honor, I would object.  I

17    didn't smell anything.

18            THE COURT:  Well, I have to say, I want to smell

19    these drugs before they are taken away again.

20            MS. EISENSTEIN:  Yes, your Honor.

21            MS. KOUSOULIS:  In terms of my objection?

22    BY MS. EISENSTEIN:

23    Q.    Well, my question is:  Do you have a basis of

24    comparison for your ability to smell in comparison to other

25    people's?

Duerr - cross

1    A.    I have experience in our laboratory at making

2    distinctions between odors.  And in the process of doing

3    that, we have gone through some -- some comparisons, so that

4    I know my sense of smell is just fine.

5              I'm not the world's greatest at making the --

6    the distinctions between the -- the -- the various notes of

7    the odors, but as far as my sense of smell, the sensitivity

8    of my smell, it's okay.  And we checked that.

9    Q.    Now, you received extensive training in the

10   microscopic identification of marijuana; is that correct?

11   A.    Yes.

12   Q.    Have you received training about the identification of

13   the smell of marijuana as it appears in fresh or as it might

14   appear on the street in its dried form?

15   A.    No.  That's entirely from just experience.

16   Q.    But you have not received specific training on how to

17   identify the smell of marijuana; is that correct?

18   A.    No.  I know what marijuana smells like, but I've not

19   received training in that.

20   Q.    And you testified in your direct examination that the

21   volatility or the amount of smell would be greater when

22   marijuana is fresher; is that correct?

23   A.    Yes.

24   Q.    And so the fresher the substance is, the more it would

25   smell; is that correct?

Duerr  -  cross

1    A.    Well, we're talking about the dramatic difference

2    between the plant and the dried material.  We're not talking

3    about weeks or months.  We're -- once it's dried, it's --

4    it's not -- it does not change a whole lot.

5    Q.    And is it your opinion that dried marijuana has an

6    odor?

7    A.    Oh, it has an odor, sure, but not much.

8    Q.    And when this substance was seized on November 26th,

9    2007, would you agree that it was fresher at that point than

10   it is today?

11   A.    Now, that's what I was getting at.  The -- the

12   difference between fresh marijuana in the plant and the

13   dried material is a huge difference.  But by the time it

14   becomes dry, all the -- most of the volatile material has

15   been removed, so that the difference between six months ago

16   and now would be trivial.

17   Q.    Now, your experience based on the smell of marijuana,

18   that was in a lab environment; is that right?

19   A.    Yes.

20   Q.    And in the lab environment, is it fair to say that

21   there are vents and ventilation that is provided, especially

22   since you're handling drug evidence?

23   A.    Actually, the -- the examination of the drug evidence

24   in my laboratory is done in our conference room, which is

25   well removed from the items you are mentioning, and the

Duerr  - cross

1    examination in the police laboratory is also done in a

2    conference room, because they won't let me in the police

3    laboratory.  So it's basically an office environment.

4    Q.    And it's not an enclosed environment such as a car, is

5    it?

6    A.    It is not -- correct.  It is not like a car.

7    Q.    And have you done any empirical studies or tests of

8    what happens when any quantity of marijuana is located in a

9    closed car with regard to its smell?

10   A.    I have not done those studies, no.

11   Q.    And what about when -- you testified on direct that

12   the fact that the heat was on in the car would, in your

13   opinion, have no effect.

14          Was that opinion based on any actual studies

15   that you, yourself, have done or reviewed?

16   A.    No.  It's based on the temperature of the car not

17   being significantly different from room temperature.

18   Q.    But you have never actually tested that hypothesis

19   that you just stated, that if marijuana, for example, were

20   in a closed car, the smell might be stronger to the

21   perceiver than, let's say, in a conference room?

22   A.    Well, we're not going to controvert the laws of

23   physics here.  Volatility is volatility and you've got to

24   have a lot of -- you've got to have a high temperature

25   for there to be the kind of an odor that you are talking

33

Duerr  - cross

1  about.

2  Q.    Well, what if, for example, the marijuana was not in

3  the heat-sealed bag, but, rather, was as it appears in

4  Government's Exhibit 1A, in bags with residue actually

5  physically on the outside.  Then, would the fact that the

6  marijuana, in your opinion, was in a closed car with the

7  heat on, would that impact the ability of somebody standing

8  right outside the car to perceive that smell?

9  A.    A couple of particles of marijuana, no, I don't

10  believe that would change my opinion.

11  Q.    What about the length of time that the marijuana was

12  in the car?  Would that affect the level of smell that

13  someone was able to perceive?

14  A.    No.

15  Q.    Do you know whether that bag was opened by Ewell prior

16  to it being seized by him on November 26th, 2007?

17  A.    No.

18  Q.    Do you know whether Ewell or anyone else packaged that

19  bag of marijuana inside the car prior to the stop?

20  A.    No.

21  Q.    Do you know whether there was any residual marijuana

22  that might have been on the defendant's hand at the time of

23  the stop?

24  A.    No.

25  Q.    Is it your opinion that any of those things might

Duerr - redirect

1    smell?

2    A.    I don't believe they would, no.

3            MS. EISENSTEIN:  Nothing further, your Honor.

4            THE COURT:  Redirect.

5                        REDIRECT EXAMINATION

6    BY MS. KOUSOULIS:

7    Q.    Just briefly to follow up on some of Ms. Eisenstein's

8    questions.

9            So it's your testimony that the temperature of

10   the car would not be significant enough to change the

11   volatility of the marijuana to cause it to emit a noticeable

12   odor?

13   A.    Yes.

14   Q.    And in the context of the facts of this case, with the

15   marijuana being in the sealed bags, four sealed bags in

16   another plastic bag in a jacket pocket, is there -- is it --

17   is there likely to be an odor sufficiently emanating from

18   the car for someone to notice the smell?

19   A.    No.

20           MS. KOUSOULIS:  I have no further questions.

21           THE COURT:  Anything else, or may this witness

22   be excused?

23           MS. KOUSOULIS:  Your Honor, I would ask -- the

24   government is calling an expert, and I may want to, based on

25   that, recall Dr. Duerr.

Duerr - redirect

1                THE COURT:  All right.

2                MS. KOUSOULIS:  So I would just ask that he

3    remain.

4                THE COURT:  All right.  But you may step down

5    from the bench.

6                MS. EISENSTEIN:  Yes, your Honor.

7                THE WITNESS:  What should I do about the

8    evidence?

9                THE COURT:  Could I see it before it goes back

10   to the government, actually?

11               MS. KOUSOULIS:  Your Honor, if I just may,

12   just for the record, I have no objection to your Honor

13   smelling --

14               THE COURT:  I appreciate that.

15               MS. KOUSOULIS:  -- smelling the Government

16   Exhibit 1A.

17               The only thing I would like to note for the

18   record is that it has been handled by a number of people,

19   so I would just point out that the condition that the bags

20   are in now, even with regard to any residue being outside

21   the zip-lock, be taken into account, since I don't believe

22   there was any testimony from Officer Conkey, who recovered

23   the drugs, that this was any residue outside the bags.

24               So I would just ask that your Honor consider

25   that --

Miller - direct

1              THE COURT:  All right.

2              MS. KOUSOULIS:  -- when looking at the evidence.

3              THE COURT:  All right.

4              (Witness excused.)

5              THE COURT:  And I guess if you would like to

6    call your witness.

7              MS. EISENSTEIN:  Yes, your Honor.

8              The government calls to the stand Special Agent

9    Eric Miller.

10                     PLAINTIFF'S TESTIMONY

11                  ... ERIC GEORGE MILLER, having been

12          duly sworn as a witness, was examined and testified

13          as follows ...

14                     DIRECT EXAMINATION

15   BY MS. EISENSTEIN:

16   Q.   Special Agent Miller, good afternoon.  Can you just

17   state your name for the record, please?

18   A.   Eric George Miller.

19   Q.   If you would just pull the microphone up.  Thank you.

20              And where do you currently work?

21   A.   I'm currently employed by the U.S. Department of

22   Justice, Drug Enforcement Administration, here in

23   Wilmington, Delaware.

24   Q.   Is that abbreviated DEA?

25   A.   Yes, it is.

Miller - direct

1   Q.     How long have you worked for the DEA?

2   A.     Over 18 years.

3   Q.     What is your position there, currently?

4   A.     I'm a Special Agent.

5   Q.     During the course of your experience as a DEA agent,

6   how long -- do you have experience specifically handling

7   drug evidence?

8   A.     Yes, I do, both as seizing agent of numerous

9   controlled substances throughout the years.  I've also

10  been, off and on, for 12 years, the drug evidence custodian

11  in our, both this office and previous offices, in that I

12  handle all drugs that come in and go out of our office.

13  Q.     Does that specifically include handling marijuana

14  evidence that's seized?

15  A.     Yes, it does.  Currently, our office right now is the

16  marijuana storage for the whole Philadelphia division, so we

17  literally have thousands of pounds in and out of our office

18  at any given time.

19  Q.     Now, do you receive, as part of your training

20  and experience as a DEA agent, do you receive specific

21  training in the identification and smell of controlled

22  substances?

23  A.     Yes.  In the 12-and-a-half week basic DEA Academy that

24  I attended, we had training in both the smell of freshly cut

25  marijuana and burning marijuana.  Prior to that, I also

Miller - direct

1    received training from attending schools when I was at

2    Glassboro -- a Glassboro police officer in Glassboro, New

3    Jersey.

4    Q.    And what about your experience with regard

5    specifically to the smell and identification of marijuana?

6    Can you just estimate for the Court the number of seizures

7    you've been involved in that have involved marijuana

8    evidence?

9    A.    It's going to be a high number since being evidence

10   custodian.  Say well over 250.

11   Q.    Were you involved in -- have you had experience

12   seizing marijuana evidence in the field?

13   A.    Yes, I have.

14   Q.    As part of, let's say, when you're out on the street,

15   making stops that involved marijuana evidence?

16   A.    Yes, I have.

17   Q.    And what about with regard to different quantities of

18   marijuana in those seizures?  Can you explain for the Court

19   the range of quantity of marijuana that has been involved in

20   various seizures?

21   A.    Yes.  It ranges the whole gamut from small individual

22   $5 bags, which these appear to be, all the way up to, you

23   know, 25 and 50-pound bales of marijuana.

24   Q.    And when you say these appear to be, do you mean the

25   little packets that are part of Government's Exhibit 1A?

Miller - direct

1    A.    Yes, I do.

2    Q.    You would describe those as $5 bags?

3    A.    Yes.

4    Q.    Now, when you have -- you said that you've made

5    seizures involving fresh marijuana.  The actual seizures

6    that you've done involving fresh marijuana, can you estimate

7    about how many those are?

8    A.    Well in excess of 50.

9    Q.    And do you hae experience in handling marijuana and

10    seizing marijuana that has been packaged in plastic baggies

11    such as Government Exhibit 1A wrapped in plastic?

12    A.    Yes, I have.

13    Q.    Would you say in your general experience that that

14    form of packaging marijuana is common on the street in the

15    seizures that you've seen?

16    A.    Yes.  It's very common.

17    Q.    And do you have a position currently specifically

18    involving marijuana in the State of Delaware?

19    A.    Yes.  I am currently the marijuana eradication

20    coordinator for Delaware.  I keep statistics and control all

21    the funds throughout the State of Delaware for marijuana

22    eradication.  I also conduct training to local and state

23    officers and civil air patrol on marijuana eradication and

24    attempt to be there for all marijuana fields that are

25    discovered in the State of Delaware.

Miller - direct

1          MS. EISENSTEIN:  Your Honor, at this time the

2   government moves for the qualification of Eric Miller in

3   the identification of both smell and appearance of

4   marijuana.

5          MS. KOUSOULIS:  If I could ask a few questions.

6   BY MS. KOUSOULIS:

7   Q.    Good afternoon, Agent Miller.

8   A.    Good afternoon, ma'am.

9   Q.    You testified that you have been, off and on, evidence

10  custodian for the last 12 years; is that correct?

11  A.    That is correct.

12  Q.    How much would you say, what percentage of your job is

13  as evidence custodian?

14  A.    It was all of 12 years, and then I was -- I switched

15  positions to be a technical agent in our office, so it was

16  that full 12 years out of my 18 years experience.

17  Q.    Now, you said that you received training in the smell

18  of unused marijuana and burnt marijuana; is that correct?

19  A.    That is correct.

20  Q.    And when you say training, what kind of training --

21  what was the specific training you received?

22  A.    I attended basic two-week school when I was a

23  Glassboro police officer, where they had cut marijuana

24  there, not burnt or dried, for us to be able to smell.

25          They had dried marijuana for us to smell and

Miller - direct

1    then they placed some of the marijuana in a coffee can,

2    literally, and burned it, and allowed us to smell that.

3    And that's also similar training that I had at the DEA

4    Academy.

5    Q.    And you talked about your experience in actually

6    seizing marijuana as part of your duties as an agent and

7    then collecting evidence and storing evidence as custodian;

8    is that right?

9    A.    That is correct.

10   Q.    And in your duties as -- in actually seizing the

11   evidence, approximately how many cases have you been

12   involved in where you seize marijuana for $5 bags or

13   less?

14   A.    Or less?  Well over 25.

15   Q.    And as evidence custodian for the DEA, for the drug

16   evidence custodian, it's fair to say that most of the drugs

17   that you're storing are large quantity drugs; is that

18   correct?

19   A.    Correct, but not in respect to marijuana.  We --

20   we often seize small quantities of marijuana along with

21   what we call user amounts of marijuana along with the

22   larger portions of cocaine and crack cocaine that we seize

23   from the, you know, the distributors, the person selling

24   them.  Quite often they have small, what we call personal

25   use amounts of marijuana on them, and we seize those and

Miller - direct

1    just send them to our lab.

2    Q.    Now, when you, as evidence custodian, when you receive

3    drug evidence from other officers, or other agents, you are

4    many times not involved in the actual seizure of that

5    evidence.  You are just the custodian of it after it has

6    been seized by another agent or officer?

7    A.    Yes.  They will take the marijuana, place it in an

8    evidence bag, heat seal it in our evidence bags, which you

9    have seen, complete the paperwork and turn it over to me,

10   and I would log it in our evidence log.

11   Q.    So it's fair to say as evidence custodian, the

12   evidence you receive, the marijuana evidence you receive, is

13   in a heat-sealed evidence bag before you get it?

14   A.    If it's a small quantity, yes.  If it's a large bale,

15   it's not.

16   Q.    But in terms of small quantities of marijuana

17   evidence, as evidence custodian, when you receive it, it's

18   always in a heat-sealed bag; correct?

19   A.    Correct.

20   Q.    And you store it in the heat-sealed bag; correct?

21   A.    Correct.

22   Q.    And as an agent, when you are in the field and you

23   make arrests, those times that you seize the marijuana --

24   strike that.

25              MS. KOUSOULIS:  Your Honor, I have no further

Miller - direct

1    questions.

2              THE COURT:  All right.  He is accepted -- is

3    there an objection?

4              MS. KOUSOULIS:  No, your Honor.

5              THE COURT:  He is accepted as an expert.

6    BY MS. EISENSTEIN:

7    Q.    Now, in your experience, does marijuana in its dried

8    form, such as in Government's Exhibit 1A, have a distinctive

9    smell?

10   A.    Yes, it does.

11   Q.    And can you just give some kind of description about

12   the type of smell or the strength of smell that marijuana in

13   its dried form has, in your opinion?

14   A.    Well, in its dry form, as marijuana dries out, the

15   odor lessens.  Okay.  To use an example, if you pick fresh

16   basil out of your garden and smell it, it's going to have a

17   stronger, more prominent odor.  If you go to your cabinet,

18   your spice cabinet, and take out some dried basil, you are

19   still going to be able to tell that it's basil.  It's just

20   going to have less of a smell.

21   Q.    And so in your opinion, does marijuana behave similar

22   to other herbs, such as the one you describe, basil,

23   or things that other people might have common experience

24   with?

25   A.    Exactly.  The process is the same as it dries.

Miller - direct

1    Q.    Now, do you have experience with different factors

2    that might affect the strength of the smell of marijuana,

3    particularly, let's say, if the marijuana were seized in a

4    car?

5    A.    Yes, I do.

6    Q.    And have you made seizures of marijuana, small

7    quantities of marijuana, from somebody who is in a vehicle?

8    A.    Yes, I have.

9    Q.    And in your particular experience, have you able to

10   detect the odor of marijuana in small quantities, such as

11   Government's Exhibit 1A?

12   A.    Yes, I have.

13   Q.    And just for the record, you have reviewed

14   Government's Exhibit 1A; is that correct?

15   A.    Yes, I did.

16   Q.    And were you able to detect an odor currently from

17   Government's Exhibit 1A?

18   A.    Yes, I was, earlier.

19   Q.    If you could review Government's Exhibit 1A, do you

20   currently detect an odor?

21   A.    Yes.  It's even stronger now.  The more it's handled,

22   the stronger the odor will be.

23   Q.    And can you describe for the Court an example of the

24   time when you seized a small quantity of marijuana and

25   were able to identify a noticeable odor in a car-type

Miller - direct

1    situation?

2    A.    Yes.

3    Q.    You don't need to give a particular case name.

4    A.    Okay.

5    Q.    If you can describe what happens.

6    A.    We arrested an individual in a car, a female, who had

7    a small quantity of marijuana located in a purse directly

8    next to her, and as I was coming in from the passenger side,

9    searching the car, clear distinct smell of marijuana

10   emanating from her purse.

11   Q.    And how far away at that time were you from the purse?

12   A.    Three to four feet.

13   Q.    Were you standing at the door of the passenger side or

14   some distance?

15   A.    I was just starting to come in.

16   Q.    And was the window just rolled down?

17   A.    No.  I had just opened the door.

18   Q.    And then you actually seized that marijuana in that

19   particular case.

20         Was it packaged in plastic zip-lock baggies, or

21   how was it packaged?

22   A.    It was actually in -- if I remember my math right,

23   it was a bag slightly larger than this.  These are referred

24   to as coin bags and they're several sizes and it was in two

25   baggies justthe next size up from this bag.

Miller - direct

1    Q.    Was that a zip-lock bag?

2    A.    Yes.  Exactly the same style.

3    Q.    And going back to your experience in seizing marijuana

4    from cars, can you describe a few of the factors that, in

5    your experience, particular experience, affect the strength

6    of the smell of marijuana?

7    A.    Yes.  In my experience, both on the street, with cars,

8    and our own drug evidence vault, they act as what I always

9    call secondary containers.

10   Q.    And by they, do you mean the car?

11   A.    The car itself will act as a secondary container.

12   It will capture the marijuana smell.  So as the door or

13   window would be open, you're going to get some of the smell

14   emanating from that vehicle, as is our own drug evidence

15   room.

16            Every time I open up the evidence door in our

17   office, even though they're heat-sealed, desks 30, 35 feet

18   away, can smell the odor in our office from opening and

19   closing that door.

20   Q.    Have you had experience in making a car stop involving

21   a marijuana seizure where the heat was on versus when the

22   heat is not on?

23   A.    Yes, I have.

24   Q.    And can you describe the comparison that you have

25   observed in your own experience?

Miller - direct

1   A.    Yes.  In my experience, it intensifies the heat.

2   And I will give you an even more extreme example of that

3   other than a car stop.  Even though, in my experience,

4   depending on how long it has been in the car, how much it's

5   handled and the heat, it does intensify.

6              Our own evidence vault in our office, during

7   the winter, we noticed such a strong smell of odor coming

8   from there that we actually had to have the building manager

9   come in and shut the vents down.  Therefore --

10  Q.    The vents down to stop the heat from going into the

11  evidence room?

12  A.    Correct.  Correct.  And to stop the odor from

13  escaping.

14  Q.    And what about whether the package, the packages,

15  little packets of marijuana, were opened or not in the car?

16  Would that affect, in your opinion, the strength of the

17  smell of the marijuana?

18  A.    Oh, absolutely.  As you can tell here, the more it's

19  handled, and if it's open even a tiny bit, you are going to

20  get more smell.  If it's perfectly sealed and not handled,

21  you'll have an odor, especially if there's residue on the

22  outside of the bag.  Even though the residue may not be

23  visible, you will have an odor.

24  Q.    And what about if the bag was not opened?  Do you have

25  experience with situations with sealed bags?  Have you still

Miller - direct

1    been able, in your own experience, to detect the smell of

2    marijuana?

3    A.    Yes, I have.

4    Q.    Can you describe for the Court some, either a

5    particular example of that, or describe what you mean by

6    that?

7    A.    I can do both.  What I mean by that, recently, we

8    received a small quantity of marijuana that was sealed in a

9    zip-lock bag and placed inside side a safe, and it was

10   clearly -- the smell of marijuana was emanating before we

11   even opened the safe.

12   Q.    What about, do you use heat-sealed bags in your role

13   as evidence custodian?

14   A.    Yes, I do.

15   Q.    And what about with a heat-sealed bag?  Have you been

16   able to detect odors emanating from the -- sorry -- excuse

17   me -- the smell of marijuana emanating from a heat-sealed

18   bag?

19   A.    Yes, we have.  An example of that would be two months

20   ago now, we seized a quantity of marijuana that was placed

21   into a normal DEA evidence bag that was heat-sealed.  I then

22   placed that bag into a brown box, wrapped that with brown

23   paper, sealed all the edges with thick brown tape, brought

24   it to the post office, and had to badge the postal employee

25   who smelled the marijuana and explained to him that it's

Miller - cross

1    going to our DEA lab.

2              That's quite common.  DEA used to use other

3    means of sending their drugs to and from our lab, and we

4    have lost packages that I believe is based on an employee

5    smelling the odor coming from the boxes and then stealing

6    the packages.

7    Q.    So do you have an opinion whether the bags, as these

8    packets are packaged here, if they were placed in a, just

9    sandwich bag and in a coat pocket, such as Government's

10   Exhibit 2, whether that would have a detectable odor in a

11   heated car?

12   A.    Yes, it would.

13             MS. EISENSTEIN:  Nothing further, your Honor.

14             THE COURT:  Cross-examination.

15                       CROSS-EXAMINATION

16   BY MS. KOUSOULIS:

17   Q.    Now, officer, Agent Miller, you testified that you

18   found, in your experience, a distinction between whether the

19   heat on a car is on or off when you discover marijuana in

20   the car, is that right in terms of the odor?

21   A.    Yes.

22   Q.    And what are you basing the fact that you might detect

23   an odor, a different odor or more of an odor in certain

24   situations and other situations on the fact that -- strike

25   that.

Miller - cross

1          How are you able to determine that it's the heat

2    causing the odor to be more distinctive in certain car

3    stops?

4    A.    The heat would be one of the factors.  The heat would

5    not be in sole factor.

6    Q.    But can you state with any type of scientific

7    certainty that that was the reason that you smelled the

8    marijuana more intensely in certain cases than in other

9    cases?

10   A.    I can't say scientifically.  In my experience, I

11   believe that's what caused it.  As I gave you an example of

12   our office, the heat in our drug storage room we had to have

13   shut down to lessen the smell of marijuana emanating

14   throughout the office.

15   Q.    And it's fair to say that, in your evidence storage

16   room, you have a lot more marijuana, the quantity of

17   marijuana is rather high as compared to the four small bags

18   that were involved in this case; is that correct?

19   A.    At times, correct, but it's also much larger space.

20   Q.    Was there ever a time when you had just four bags and

21   it gave off a smell in your evidence room?

22   A.    I don't specifically recall that, no.

23   Q.    Now, you also testified that, at times, you have to

24   ship the drugs through the mail to other agencies?

25   A.    To our Northeast regional lab in New York.

Miller - cross

1    Q.    And you testified that, in your experience, different

2    postal employees have noticed the smell through the

3    packaging; is that right?

4    A.    Correct.

5    Q.    It's fair to say in those cases, what amounts of drugs

6    were involved?

7    A.    From smaller to this to larger boxes.

8    Q.    And the specific example that you gave where the

9    postal employee made a comment about smelling marijuana,

10   it's fair to say that that marijuana was a larger quantity

11   than what's involved in this case; correct?

12   A.    Correct.  I believe that was approximately one ounce

13   of marijuana.

14              MS. KOUSOULIS:  One moment, your Honor.

15              (Pause.)

16   BY MS. KOUSOULIS:

17   Q.    Now, you also in this case, the government had you

18   smell marijuana in this particular case, the four bags, to

19   see if you detected an odor; correct?

20   A.    That is correct.

21   Q.    And it was your testimony that you did detect an odor;

22   correct?

23   A.    Yes, it is.

24   Q.    And it's fair to say after you smelled the marijuana,

25   after you were asked that question -- when you were asked

Miller - cross

1   that question, the marijuana was sitting in front of you,

2   approximately -- in the bag, or next to the bag,

3   approximately three, two feet from your nose; correct?

4   A.    Correct.

5   Q.    And it's fair to say that when you were asked that

6   question, you held the marijuana up to your nose and sniffed

7   it at that time; isn't that correct?

8   A.    That's correct.

9   Q.    And it was after holding it up to your nose, directly

10  to your nose and sniffing it, that you testified that you

11  smelled the odor of marijuana; correct?

12  A.    Correct.

13  Q.    And in this case, it's fair to say that the marijuana

14  had been handled quite a bit since it was recovered back on

15  the day of Mr. Ewell's arrest; correct?

16  A.    It has been handled.

17  Q.    From what you know of this case, it was -- it's fair

18  to say that the marijuana was -- after it was taken from the

19  jacket pocket, was sent back and forth to the Medical

20  Examiner's Office on at least two occasions for analysis and

21  was handled by yourself, Officer Conkey, and perhaps other

22  people; correct?

23  A.    It looks like it was turned in to the drug vault on

24  December 6th, removed on December 10th, and then again in --

25  on April 14th, and then this morning.

Miller - cross

1           MS. KOUSOULIS:  One moment, your Honor.

2           (Pause.)

3           MS. KOUSOULIS:  I have no further questions.

4           THE COURT:  Redirect.

5           MS. EISENSTEIN:  Nothing further for this

6      witness, your Honor.

7           THE COURT:  All right.  You may step down.

8      Thank you.

9           (Witness excused.)

10          MS. EISENSTEIN:  Your Honor, the government has

11     nothing further by way of rebuttal.

12          THE COURT:  Anything else, Ms. Kousoulis?

13          MS. KOUSOULIS:  One moment, your Honor.

14          THE COURT:  All right.

15          (Pause.)

16          MS. KOUSOULIS:  I have no further evidence, your

17     Honor.

18          THE COURT:  All right.  Are you all going to

19     submit some post-hearing briefs?

20          MS. KOUSOULIS:  Yes, your Honor.

21          MS. EISENSTEIN:  Yes, your Honor.

22          THE COURT:  All right.  Work out a briefing

23     schedule and file something so we know when to expect

24     papers.

25              Thank you very much.

54

Miller - cross

1              MS. KOUSOULIS:  Thank you.

2              MS. EISENSTEIN:  Thank you, your Honor.

3          (Court recessed at 12:42 p.m.)

4                    -  -  -

5

6                    I  N  D  E  X

7

8    PLAINTIFF'S TESTIMONY

9    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

10   Brian E. Conkey        4        7        11        --

11   Eric George Miller    36       49        --        --

12

13

14   DEFENDANT'S TESTIMONY

15   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

16   Brian E. Conkey       13       --        --        --

17   Stephen Duerr         16       28        34        --

18                    -  -  -

19

20

21

22

23

24

25